IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

ROBERT CARL SHARP and
WAYNE CHRISTOPHER WATKINS,

   Defendants.

No. CR15-0031

REPORT AND RECOMMENDATION

---

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................... 2

II.   PROCEDURAL HISTORY ................................. 2

III.   RELEVANT FACTS ..................................... 2
   A.   Background ...................................... 2
   B.   State Tracking Warrant ........................... 3
   C.   Federal Search Warrant ........................... 6

IV.   DISCUSSION ........................................ 13
   A.   Is the State Tracking Warrant Valid? .................... 14
   B.   If Information Obtained from the Tracking Warrant is
     Removed from the Application for the Federal Search Warrant,
     does the Application Nonetheless Support Probable Cause to
     Search Watkins' Residence? ......................... 20
   C.   Does Watkins have Standing to Challenge the
     State Tracking Warrant? ............................ 22
   D.   Summary ...................................... 24

V.   RECOMMENDATION ................................. 24

# I. INTRODUCTION

On the 17th day of August 2015, this matter came on for hearing on the Amended Motion to Suppress (docket number 60) filed by Defendant Wayne Christopher Watkins on August 5, 2015, and the Amended Motion to Suppress Evidence and Request for a *Franks* Hearing (docket number 64) filed by Defendant Robert Carl Sharp on August 13. The Government was represented by Assistant United States Attorney Dan Chatham. Defendant Sharp appeared in person and was represented by his attorney, Joel J. Schwartz. Defendant Watkins also appeared in person and was represented by his attorney, Leslie E. Stokke.

# II. PROCEDURAL HISTORY

On March 31, 2015, both Defendants were charged by indictment with conspiracy to manufacture and distribute a controlled substance (Count 1) and possession with intent to distribute and aiding and abetting the possession with intent to distribute a controlled substance (Count 3). In addition, Sharp was charged with possession with intent to distribute a controlled substance (Count 2). At their arraignments, both Defendants entered pleas of not guilty. Trial was scheduled for June 22, but then continued upon joint motion filed by the parties to October 5.

# III. RELEVANT FACTS

## A. Background

Special Agent Jessie Whitmer of the Iowa Division of Narcotics Enforcement ("DNE") testified regarding the circumstances underlying the searches which are the subject of Defendants' motions to suppress. On March 31, 2014, Sharp's ex-girlfriend called DNE headquarters and reported that she had information regarding a subject selling "Spice" in Iowa City.[1] Over the next two days, Whitmer had multiple contacts with the

---

[1] In an affidavit filed in support of a state tracking warrant, Agent Whitmer (continued...)

woman (whom I will refer to as "CG"), including phone conversations and text messages. Whitmer also contacted Iowa City Police Officer Jerry W. Blomgren, who is assigned to the DEA Drug Task Force, and who was conducting an independent investigation regarding Sharp's alleged distribution of synthetic cannabinoids. Authorities in Illinois were also investigating Sharp's alleged illegal activities.

On April 3, 2014, Agent Whitmer obtained a state tracking warrant for an orange Land Rover registered to Sharp.[2] On May 6, 2014, Task Force Officer Blomgren applied for, and received, six federal search warrants. In his application, Blomgren included information obtained from the state tracking warrant. Defendants do *not* claim the federal search warrants are defective in some way or are not supported by probable cause. Instead, Defendants challenge the validity of the underlying state tracking warrant, claiming Whitmer's application contained false statements and omitted material facts. Defendants argue the state tracking warrant is invalid and, therefore, the federal warrants are fruit of the poisonous tree.

## B. State Tracking Warrant

On April 3, 2014, Agent Whitmer submitted an application to Iowa District Associate Judge Stephen Gerard for a mobile tracking device on an orange Land Rover registered to Sharp. In attachment A to his sworn application, Whitmer advised Judge Gerard of the following:

---

[1](...continued)
describes "Spice" as "synthetic marijuana." In its brief filed in response to the instant motions, the Government states it is more accurately described as a "synthetic cannabinoid" product.

[2] A copy of the state tracking warrant, together with the application and return, was introduced as Government's Exhibit 1.

- In early March 2014, Officers received "conflicting information" regarding Pipe Dreamz selling synthetic marijuana "and also information that they have stopped selling synthetic marijuana."

- On March 21, 2014, officers attempted to purchase synthetic marijuana at Pipe Dreamz using Confidential Source #2014-0002 (hereafter "CS2"), but CS2 was told he would have to come back around 4:00 p.m. An unknown male employee told CS2 "he looked everywhere, but he assumed 'He' took it with him last night." The employee talked about "raids happening everywhere" and opined that "'He' was probably just 'Being smart.'"

- On March 31, 2014, Agent Whitmer was advised that a female had contacted DNE headquarters and wished to speak to someone in the Iowa City area.

- Later that morning, Agent Whitmer spoke with CG and was told that "she was providing information with the hope that it could help her on a driving while revoked charge."[3] Whitmer told CG that he couldn't promise anything, but that she could have the prosecutor contact him.

- CG told Agent Whitmer that she had dated Sharp for approximately one year and nine months and, during that time, he was ordering "Spice" in bulk from China. Sharp also ordered his own packaging and he and Watkins were "putting the stuff together in Watkins' basement."

- According to CG, Sharp previously had a storage unit, "but now stores 'Spice' in Watkins' basement located in Cedar Rapids, Iowa." Sharp has "thousands of bags" of Spice in Watkins' basement.

---

[3] CG was identified by name in the supporting attachment provided to Judge Gerard.

4

- Sharp owns a store in Iowa City, identified as "Pipe Dreamz." According to CG, however, "if 'Pipe Dreamz' had any 'Spice' at the store then it would only be a small amount."

- Sharp has a residence in Center Point.

- Sharp has at least $200,000 stored as his mother's residence in Illinois.

- Sharp is usually in Iowa Monday through Thursday, which CG believed was a violation of Sharp's probation or parole in Illinois.

- Sharp brings 500 to 1,000 bags of Spice with him when he comes from Illinois and "drops some of it off on the way to Peoria."

- Sharp sent CG Facebook messages regarding how much money he was making and "she didn't believe it was from selling pipes."

- CG provided Agent Whitmer with Sharp's birth date and identified the types of vehicles he was driving.

- Sharp used to keep his money in a safety deposit box, but he told CG that "he took all the money out and left a note for the police that said 'Fuck You.'"

- CG provided Agent Whitmer with photographs of Facebook chat on January 30, 2014, where Sharp stated that he was "making big dough again today" and reported that his store "did 6 grand yesterday."

- Agent Whitmer received a Pipe Dreamz business card from Detective Jerry Blomgren of the Iowa City Police Department, identifying "Bobby and Tashia" as its owners.

- CG sent a text message to Agent Whitmer, identifying Markie McClary and Bridgitt Hart as two persons who buy Spice from Sharp and then sell it.

- CG told Agent Whitmer that Sharp and Watkins sprayed the Spice in Watkins' basement.

- On April 2, 2014, Agent Whitmer drove by a residence associated with Sharp in Center Point, Iowa, and identified two vehicles, including an orange Land Rover, belonging to Sharp. Another vehicle observed at the residence was registered to Mark McClary (one of the persons identified by CG as buying Spice from Sharp for resale).

- Agent Whitmer drove by the residence of Watkins in Cedar Rapids and observed a vehicle registered to Jessica LeRoy. Officers had previously observed Sharp's Facebook page, which identified Sharp in a relationship with LeRoy.

- Later on April 2, Agent Whitmer drove by Pipe Dreamz and observed the same orange Land Rover which he had seen earlier in the day at Sharp's residence in Center Point.

Based upon the information provided in the application and attachments, Judge Gerard found probable cause to believe the orange Land Rover was being used to transport controlled substances and, therefore, authorized the installation of a tracking device until "the objective of the investigation is reached or, in any event, at the end of ninety (90) days from the date of this warrant, whichever is earlier."

### C. Federal Search Warrant

On May 6, 2014, Iowa City Police Officer Jerry W. Blomgren, who is assigned to the DEA Drug Task Force, submitted six applications to me for federal search warrants, using the same affidavit.[4] The search warrant applications sought authority to search Pipe Dreamz, Sharp's residence in Center Point, Watkins' residence in Cedar Rapids, an orange Land Rover, a black Chevrolet Camaro, and a storage unit in Center Point. The supporting affidavit signed by Blomgren extends 34 pages and consists of 77 numbered

---

[4] The affidavit and one of the applications, including the resulting search warrant and return, were introduced as Government's Exhibit 2.

paragraphs. The specific facts supporting probable cause to search the four locations and two vehicles are found in paragraphs 18-64. In his affidavit, Blomgren advised the Court of the following:

On February 24, 2014, an individual identified as "Jeremy" was arrested in Pekin, Illinois, for possession with intent to deliver synthetic cannabinoids, also known as K-2. Jeremy told authorities he had purchased the controlled substance from Mark McClary, who obtained it from "a guy named 'Robert' in Iowa."

On February 27, 2014, an individual identified as "James" in Creve Coeur, Illinois, was found in possession of approximately 192 bags of suspected synthetic cannabinoids. James told authorities that he had purchased the synthetic cannabinoids from Robert Sharp in Iowa City approximately three days earlier. According to James, he purchased K-2 from Sharp on four different occasions during the preceding month.

Sharp is the owner of Pipe Dreamz in Iowa City, a self-described "counter culture boutique." On February 28, 2005, Sharp was sentenced in the United States District Court for the Central District of Illinois to 180 months' imprisonment for possession with intent to distribute 5 grams or more of crack cocaine. Sharp's sentence was later reduced to 132 months and he was released from federal prison on about April 2, 2012. Sharp is currently under the supervision of the United States Probation Office in Illinois.

On March 5, 2014, Officer Tipsword with the Peoria Multi-County Enforcement Group ("PMEG") spoke with Michael Christerson at the Woodford, Illinois, County Jail. Christerson reported that he was supplied with synthetic cannabinoids by Dakota Bucher, but he knew that Bucher's source for the substances was an individual known as "Bob." According to Christerson, Bob owned a store called "Smoke N Ink" in Peoria. The Springfield, Illinois, office of the DEA had previously investigated Sharp as a retail dealer of synthetic cannabinoids and the former owner of Smoke N Ink. Just prior to serving a

search warrant on the Smoke N Ink store, however, the business was vacated and Sharp left town.

Christerson also reported that in August or September 2013, he drove to Iowa at Bucher's request to pick up 200 bags of Spice from Bob. While at Bob's house, Christerson observed approximately 50 boxes containing approximately 10,000 bags of synthetic cannabinoids. Christerson, who could accurately describe Bob, could not identify Bob's address, and could not "definitively identify" photographs of Sharp's current and former residences, or Watkins' current residence.

Also on March 5, 2014, Officer Blomgren spoke to a person in Iowa City "who provided information regarding various shops in the Iowa City area distributing synthetic products." Blomgren "signed up this person as a confidential source," and referred to him in the affidavit as CS2.[5] CS2 told Blomgren that he had purchased synthetic drugs from Pipe Dreamz on a number of prior occasions, but indicated that Pipe Dreamz "may have recently stopped selling the 'banned' synthetic drugs."

On March 10, 2014, authorities attempted a controlled buy at Pipe Dreamz using another informant in Iowa City ("CS3"). Under controlled circumstances, CS3 entered the Pipe Dreamz store and attempted to purchase synthetic drugs. CS3 was told by an unknown Pipe Dreamz employee, however, that "they did not currently sell these items."

On March 21, 2014, a controlled purchase was attempted using CS2. CS2 entered the Pipe Dreamz store and asked about purchasing a synthetic cannabinoid product. The store employee (whose identity is unknown) told CS2 that he would have to come back after 4:00 p.m. because "he" (believed to be a reference to Sharp) had taken them with him last night. According to the employee, "he" was probably "just being smart." CS2

---

[5] At the hearing on the instant motions for summary judgment, CS2 was described as a homeless person in Iowa City.

and the employee discussed several "raids" that had taken place in Iowa regarding synthetic drugs.

On March 31, 2014, Iowa DNE Special Agent Jessie Whitmer was advised that a woman ("CS1") had contacted the DNE and wished to speak with someone regarding Sharp's distribution of synthetic drugs in the Iowa City area. (CS1 was identified in the affidavit for the tracking warrant by name, and is referred to in this report and recommendation as CG.) CS1 told Whitmer that she had dated Sharp for approximately one year and nine months, but their relationship ended in February 2014. According to CS1, Sharp purchased Spice in bulk from China and ordered his own packaging. Sharp and Watkins were then "manufacturing the synthetics" in Watkins' basement. CS1 admitted that she had not been to Sharp's current residence in Center Point or to Watkins' residence in Cedar Rapids.

CS1 said Sharp had a storage unit at one time, but now stored all of his Spice in Watkins' basement. Sharp told CS1 that he had "thousands of bags" of Spice in Watkins' basement. CS1 also identified Sharp as the owner of the Pipe Dreamz store in Iowa City. According to CS1, if Sharp had any Spice at the store, it would only be a small amount.

According to CS1, Sharp had at least $200,000 stored at his mother's residence in Illinois. Sharp was usually in Iowa Monday through Thursday, but returned to Peoria sometimes on the weekends. CS1 didn't know if Sharp was permitted to leave the state of Illinois because he was on probation or parole. CS1 produced Facebook messages from Sharp describing substantial sums of cash generated from his business, which CS1 did not believe was "from selling pipes."

In a subsequent phone call on March 31, CS1 provided Agent Whitmer with Sharp's birth date and described the vehicles which he drove, including an orange Land Rover and a Chevrolet Camaro. CS1 also explained that Sharp used to keep his money in a safety

9

deposit box, but he took all of the money out and left a note for the police that said "Fuck You." Sharp then took his money to his parents' residence.

On April 1, 2014, Agent Whitmer received a text message from CS1, indicating that Markie McClary of Pekin, Illinois, buys Spice from Sharp and then sells it.

On April 2, 2014, Agent Whitmer drove by Sharp's residence in Center Point and observed an orange Land Rover and a black Camaro registered to Sharp. Whitmer also observed a Jeep Cherokee registered to Mark McClary. Whitmer then drove passed Watkins' residence in Cedar Rapids and observed a vehicle registered to Jessica LeRoy. On March 31, Whitmer had observed Sharp's Facebook page, which identified Sharp as being in a relationship with LeRoy. Later in the day, Whitmer drove by Pipe Dreamz in Iowa City and observed the orange Land Rover which he had seen earlier that day in Center Point.

On April 3, 2014, Agent Whitmer obtained a state tracking warrant for Sharp's Land Rover, and the tracking device was attached early in the morning on April 7 at Sharp's residence in Center Point. During several days of monitoring, Whitmer observed a pattern where Sharp would leave his home in Center Point, travel to Watkins' residence in Cedar Rapids, and then proceed to the Pipe Dreamz store in Iowa City.

On April 13, 2014, GPS data from the tracking warrant showed Sharp traveling from his home in Center Point to Watkins' residence in Cedar Rapids, and then on to Pipe Dreamz. The Land Rover then traveled to Peoria, where it made several stops at locations that appeared to be "head shops," which Blomgren knew were "commonly used as places to distribute synthetic drugs." Sharp also stopped at the home of Kimberly Muzzarelli, who had been previously identified as a member of Sharp's distribution network.

On April 15, 2014, investigators conducted a trash pull at Watkins' residence in Cedar Rapids and discovered numerous documents associated with Watkins and identifying the residence as his address.

On April 19, 2014, a confidential informant ("CS4") told the Peoria multi-county enforcement group ("PMEG") that he had been purchasing synthetic cannabinoids from Sharp. During a conversation on the preceding day, Sharp instructed CS4 to pick up the drugs from Kimberly Muzzarelli at her residence in Washington, Illinois. Based on this information, PMEG conducted a controlled purchase of synthetic cannabinoids from Muzzarelli on April 25, 2014. CS4 informed officers after the controlled buy that Muzzarelli stated she was going to drive to Iowa the next day to purchase more synthetic cannabinoids from Sharp.

On the following day, April 26, 2014, law enforcement authorities conducted surveillance on Sharp and Pipe Dreamz. Muzzarelli was observed meeting Sharp outside the Pipe Dreamz store and Sharp was observed loading several large white plastic bags into Muzzarelli's vehicle.[6] Officer Blomgren observed Sharp and Muzzarelli going through one of the plastic bags, with Sharp holding "foil-type packages consistent in appearance with common packaging for synthetic cannabinoids." Muzzarelli then returned to her home in Illinois and investigators observed her carrying the bags into her residence.

In April 2014, Officer Blomgren reviewed a building permit application submitted by Sharp, dated July 30, 2013. At that time, Sharp listed his address as Cedar Rapids, Iowa, although Blomgren believed Sharp was currently residing in Center Point, Iowa. A check of Sharp's driver's license issued on January 11, 2013 listed Sharp's address in Peoria, Illinois. A record check also revealed an orange Land Rover registered to Sharp.

On May 1, 2014, officers conducted surveillance at Sharp's residence in Center Point. They observed Sharp transferring garbage bags from the Camaro to the Land Rover. Sharp then drove the Land Rover to Pipe Dreamz. Sharp was then observed carrying a bag from the Land Rover into Pipe Dreamz. The bags appeared to be consistent with the bags which Sharp transferred to Muzzarelli on April 26, which were believed to

---

[6] A photograph of Sharp carrying the bags was included in the affidavit.

contain synthetic cannabinoids. At approximately 9:20 p.m., the Land Rover left the Pipe Dreamz store and traveled to Watkins' residence. It then proceeded to J & R Storage, where it remained for a short period of time before returning to Sharp's residence in Center Point.

A subsequent review of the GPS log showed that Sharp stopped at J&R Storage six times between April 22 and May 2. An investigator contacted J & R Storage and was told of suspicious activity relating to "James Shipman." The woman at J & R Storage described the suspicious person and his vehicle, which matched the description of Sharp and the orange Land Rover.

On May 2, 2014, another confidential informant ("CS5") met with the Johnson County Drug Task Force in preparation of an attempted controlled purchase of synthetic cannabinoids from Sharp. CS5 identified photographs of Sharp and Watkins, who CS5 knew as "Bob" and "Duane" or "Wayne Dog," respectively. CS5 said Watkins had previously worked with Sharp in the Peoria area and was currently working with Sharp in Iowa. After being equipped with a recording/transmitter device, CS5 drove to the Pipe Dreamz store in Iowa City. CS5 entered the store and asked for "Bob," but Watkins (who was working behind the counter) responded by asking if CS5 was [CS5's first name]. When CS5 responded yes, Watkins produced 120 packets of suspected synthetic cannabinoids in exchange for $1,000.

On May 4, 2014, CS1 informed investigators that she had eaten dinner with Sharp in Peoria on that day. According to CS1, Sharp stated he was getting worried that he was going to get caught selling K-2. Sharp told CS1 that he moved all of his K-2 from Watkins' house into a storage locker. Sharp said he wanted to quit selling K-2, "but the money was too good."

## IV. DISCUSSION

There were six federal search warrants issued by me on May 6, 2014. The search warrants authorized law enforcement authorities to search (1) Pipe Dreamz, (2) Sharp's residence in Center Point, (3) Watkins' residence in Cedar Rapids, (4) an orange Land Rover, (5) a black Chevrolet Camaro, and (6) a storage unit in Center Point. Defendants do not challenge the validity of four of those warrants. That is, Sharp concedes that the search warrants for Pipe Dreamz, his residence, and the two vehicles, are supported by probable cause.[7] Sharp argues, however, that if the information obtained from the state tracking warrant is removed from Officer Blomgren's application for a federal search warrant, then probable cause for the storage unit is lacking. Similarly, Watkins argues that if information obtained from the state tracking warrant is omitted, then there was no probable cause for the search warrant issued for his residence.

In response, the Government argues that the state tracking warrant was valid and, therefore, information obtained from the tracking warrant was properly included in the federal search warrant applications. The Government concedes, however, that *if* information obtained from the state tracking warrant is removed from Officer Blomgren's affidavit in support of the federal search warrant, then probable cause to search the storage unit is missing. That is, the Government agrees that if the state tracking warrant is invalid, then the federal search warrant for Sharp's storage unit is also invalid, and Sharp's motion to suppress must be granted. The Government makes no such concession, however, regarding the search warrant for Watkins' residence. The Government argues that even if the tracking warrant information is removed, the remaining portion of the federal search warrant application supports probable cause to search Watkins' residence. In addition, the

---

[7] Watkins apparently concedes that he does not have standing to challenge the search warrants relating to Sharp's business, home, and vehicles.

Government asserts that Watkins lacks standing to challenge the validity of the tracking warrant issued in state court.

Accordingly, to resolve the two motions to suppress, the Court must address three questions: First, is the underlying state tracking warrant valid? If the answer is yes, then Defendants concede that the federal search warrants are supported by probable cause and no further analysis is required. If the state tracking warrant is not valid, however, and the information obtained from the tracking warrant is removed from the federal search warrant applications, then the parties agree that probable cause to search Sharp's storage unit is lacking. Second, *if* the state tracking warrant is invalid, and information obtained from that warrant is removed from Officer Blomgren's affidavit, does the remaining information in the application nonetheless support probable cause to search Watkins' residence? If the answer is yes, then the Court need not address the third question. Third, does Watkins have standing to challenge the state warrant which authorized a tracking device to be placed on Sharp's orange Land Rover?

### A. Is the State Tracking Warrant Valid?

I begin my analysis by addressing the validity of the underlying state tracking warrant. On April 3, 2014, Iowa District Associate Judge Stephen Gerard approved a warrant authorizing the installation of a tracking device on Sharp's orange Land Rover. Defendants *do not* argue the application failed to establish probable cause for the issuance of the warrant. Defendants assert, however, that the tracking warrant is invalid due to material omissions and material misstatements made by Agent Whitmer in his application, citing *Franks v. Delaware*, 438 U.S. 154 (1978). Specifically, Defendants assert the following material omissions and misstatements:

- On March 5, 2014, Officer Blomgren spoke with a confidential source, who provided information regarding various shops in the Iowa City area

14

distributing synthetic products.[8] CS2 told Blomgren that he had purchased synthetic drugs from Pipe Dreamz on a number of prior occasions, but indicated that Pipe Dreamz "may have recently decided to discontinue selling synthetic products."[9] This information was not included in Agent Whitmer's application for the tracking warrant.

- On March 10, 2014, authorities attempted a controlled buy at Pipe Dreamz using another informant.[10] The attempted controlled buy was unsuccessful, however, when an unknown Pipe Dreamz employee advised the informant that "they did not sell these items."[11] This information was not included in the application for a tracking warrant.

- On March 21, 2014, another controlled purchase was attempted at Pipe Dreamz, using CS2. On this occasion, a Pipe Dreamz employee told CS2 he would have to come back after 4:00 p.m., because the employee believed "he" (believed to be a reference to Sharp) had taken them with him last night. According to the employee, "he" was probably "just being smart."

- On March 31, 2014, the Iowa DNE was contacted by a woman who wanted to provide information regarding Sharp's distribution of synthetic drugs in

---

[8] In the application for federal search warrants, Officer Blomgren identified this person as "CS2." At the instant hearing, Agent Whitmer described CS2 as a homeless person in Iowa City.

[9] *See* docket number 64-2 at 3.

[10] This informant was identified in the application for federal search warrants as "CS3."

[11] *See* docket number 64-2 at 1.

the Iowa City area.[12] Defendants assert that Agent Whitmer's application does not fully advise Judge Gerard of the relationship between Sharp and CG, and the potential motivation for her to fabricate information.

- Similarly, Defendants note that Agent Whitmer failed to advise Judge Gerard that CS2 was paid cash for his cooperation, thereby potentially affecting his credibility.[13]

"A search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit containing false or omitted statements made knowingly and intentionally or with reckless disregard for the truth." *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001), citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

> To prevail on a *Franks* claim the defendants must show: (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining content is insufficient to establish probable cause. The same analysis applies to omissions of fact. The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*Reinholz*, 245 F.3d at 774. In determining whether statements were made with reckless disregard for the truth, the test is whether the affiant "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Conant*, _____ F.3d _____, 2015 WL 5023715

---

[12] The woman, who is identified by name in Agent Whitmer's application (and who I have referred to as "CG" in this Report and Recommendation) was later referred to as "CS1" in Officer Blomgren's application for the federal search warrants.

[13] *See* docket number 64-2 at 2.

(8th Cir., dec. August 26, 2015) (quoting *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011)). "Recklessness, however, may be inferred from the fact of omission of information from an affidavit when the material omitted would have been clearly critical to the finding of probable cause." *Id.* "*Franks* does not apply to negligent misrepresentations." *Id.* (quoting *United States v. Coleman*, 349 F.3d 1077, 1085 (8th Cir. 2003)).

I will first address the claim that Agent Whitmer's affidavit "contains deliberately false and misleading statements" regarding CG.[14] Defendants complain that in Attachment B-1, Agent Whitmer checked the box which described CG as "a concerned citizen with no reason to fabricate the information."[15] It is clear, however, that the body of the application describes the relationship between CG — who was identified by name in the application — and Sharp. Specifically, Judge Gerard was told that CG dated Sharp for approximately one year and nine months. While Whitmer believed that CG was a "concerned citizen" with "no reason to fabricate the information," Judge Gerard presumably was able to draw his own conclusions in that regard.[16]

In addition, to the extent Defendants may be arguing that Judge Gerard could not reasonably rely on information provided by CG, I reject such argument. Agent Whitmer was able to corroborate some of CG's information by conducting surveillance at Sharp's business and residence, by reviewing Sharp's Facebook messages, and by further investigation regarding car registrations.

---

[14] Watkins' Brief (docket number 60-1) at 5.

[15] *See* Government's Exhibit 1 at 12.

[16] On his "endorsement," Judge Gerard noted that the "named informant" referred to in Attachment B-1 had a "personal relationship with suspect." *See* Government's Exhibit 1 at 14.

I also reject Defendants' argument that Judge Gerard was not properly advised of the failed controlled buy at Pipe Dreamz on March 21, 2014. The fact is, Agent Whitmer's application makes it clear that no controlled substances were purchased. Instead, CS2 was told that he would have to come back around 4:00 p.m. because the employee had "looked everywhere, but he [assumed to be Sharp] took it with him last night." The employee opined that Sharp was probably just "being smart."

Next, Defendants complain that Agent Whitmer did not specifically state in his application that on March 5, CS2 told Officer Blomgren that Pipe Dreamz "may have recently decided to discontinue selling synthetic products." Whitmer also failed to specifically state that during an attempted controlled buy at Pipe Dreamz on March 10, CS3 was advised by a Pipe Dreamz employee that "they did not sell these items." Instead, Whitmer advised Judge Gerard that "[i]n early March 2014, officers received conflicting information regarding 'Pipe Dreamz' selling synthetic marijuana and also information that they stopped selling synthetic marijuana." The Government acknowledges that Judge Gerard was not provided with details regarding "information that they stopped selling synthetic marijuana," but argues that the omissions were not knowing or intentional, or with reckless disregard for the truth and, in any event, they were not "material."

Finally, Defendants complain that Agent Whitmer did not state that CS2 was receiving a cash payment. Whitmer testified at the instant hearing that prior to submitting his application for a tracking device, he listened to the tape recording of the attempted buy at Pipe Dreamz on March 21. According to Whitmer, he did not have any contact with CS2 and, in fact, did not know CS2's identity.[17] In addition, he had no knowledge that

---

[17] It should be noted that Attachment B-2 initially refers to informant "CS #2104-003." Later in the attachment, the informant is identified as "CS #2014-002." At the hearing, Agent Whitmer explained that in correcting another error, he "did a replace and replace all" when preparing the document, but because of the typo, the first reference to
(continued...)

CS2 received a cash payment for information. Whitmer testified that when he prepared the application for the tracking warrant, he was unaware of the unsuccessful attempted controlled buy at Pipe Dreamz on March 10. In his "endorsement," Judge Gerard refers to Informant B-2 (now referred to as CS2) and checks a box indicating "[t]he informant knows this information because: personal observation and conversation with suspects." Because this was a tracking warrant for Sharp's vehicle, it is presumed that Sharp was considered the "suspect." It is undisputed, however, that CS2 did not have any "personal observation and conversation" with Sharp. Rather, CS2 had contacts with Pipe Dreamz employees on occasion. Judge Gerard's endorsement also refers to "attachments A, C, D, E, F, and G," but Whitmer confirmed at the hearing that there were no attachments C, D, E, F, and G.

To prevail on a *Franks* claim, Defendants must first show that the facts were omitted "with the intent to make, or in reckless disregard of whether they make, the affidavit misleading." *Reinholz*, 245 F.3d at 774. Defendants have failed to make that showing here. In his affidavit, Agent Whitmer advised Judge Gerard that officers had received "conflicting information" regarding whether Pipe Dreamz was selling synthetic marijuana, and also received information that **they have stopped selling synthetic marijuana.** Admittedly, the affidavit does not specifically state that CS2 told Blomgren that he had purchased synthetic drugs from Pipe Dreamz on a number of prior occasions, but that Pipe Dreamz "may have recently decided to discontinue selling synthetic products." Also, the affidavit does not refer specifically to the unsuccessful attempt to purchase synthetic marijuana on March 10, 2014. Judge Gerard *was* told, however, that officers had received information that Pipe Dreamz "have stopped selling synthetic

---

[17](...continued)

"CS #2104-003" was not changed. In any event, it is undisputed that attachment B-2 refers to CS2.

marijuana." I conclude the omissions did not intentionally or recklessly make the affidavit misleading. Moreover, even if the additional details had been included, they would not have a material effect on the finding of probable cause — the second prong of the *Franks* test. *Id.*

Furthermore, I conclude that Agent Whitmer's failure to include the fact that CS2 had received a cash payment for information does not invalidate the tracking warrant. Whitmer credibly testified that he had no knowledge of the fact that CS2 had been paid. CS2 was Officer Blomgren's informant and, in fact, Whitmer did not even know his identity. The fact that Whitmer did not know CS2 had been paid was, at most, negligent. *Franks* does not apply to negligent misrepresentations or omissions. *Conant*, 2015 WL 5023715 at *4. In short, I find no *Franks* violation. Accordingly, information obtained from the tracking warrant was properly included in the application for the federal search warrants. Therefore, Defendants' motions to suppress should be denied.

### B. If Information Obtained from the Tracking Warrant is Removed from the Application for the Federal Search Warrant, does the Application Nonetheless Support Probable Cause to Search Watkins' Residence?

As set forth above, I believe there was no *Franks* violation, and the state tracking warrant was valid. Defendants concede that if information obtained from the tracking warrant is included in the application for the federal search warrants, then the resulting search warrants are supported by probable cause. Accordingly, no further analysis is required. If the district court disagrees with my conclusion regarding the validity of the state tracking warrant, however, I will also address the consequences of removing information obtained from the state tracking warrant from the applications for the federal search warrants.

The Government concedes that *if* the state tracking warrant is found to be invalid, and information obtained from the tracking warrant is removed from the federal search

20

warrant application, the resulting search warrant for Sharp's storage unit is not supported by probable cause, and Sharp's motion to suppress evidence obtained from the storage unit must be granted. However, the Government argues that even if the tracking warrant information is removed from the federal search warrant applications, the remaining information still supports probable cause to search Watkins' residence.

The affidavit submitted by Officer Blomgren in support of the federal search warrants identifies multiple sources providing information that Sharp was selling synthetic cannabinoids. Illinois authorities were investigating the sale of synthetic cannabinoids at Smoke N Ink, a store formerly operated by Sharp in Peoria. On April 26, 2014, surveillance confirmed what appeared to be the delivery of several large white plastic bags of synthetic cannabinoids from Sharp to another individual. Indeed, Sharp concedes the affidavit establishes probable cause for the search of his business, home, and two vehicles, even if information obtained from the tracking warrant is removed.

The question remains, however, of whether the information provided in the affidavit supports a finding of probable cause to search Watkins' residence, if information obtained from the tracking warrant is removed. According to the affidavit, CS1 (referred to here as CG) told Agent Whitmer that Sharp and Watkins were "manufacturing the synthetics" in Watkins' basement. Sharp allegedly told CS1 that he had "thousands of bags" of Spice in Watkins' basement. On April 2, 2014, Whitmer drove by Watkins' residence in Cedar Rapids and observed a vehicle registered to Jessica LeRoy, who was identified on Sharp's Facebook page as being in a relationship with Sharp. CS5 told investigators that Watkins had previously worked with Sharp in the Peoria area and was currently working with Sharp in Iowa. On May 2, 2014, CS5 entered Pipe Dreamz and asked for "Bob," but Watkins (who was working behind the counter) responded by asking if CS5 was [CS5's first name]. When CS5 responded yes, Watkins produced 120 packets of synthetic cannabinoids in exchange for $1,000. Two days later, however, on May 4, CS1 told investigators that she

had eaten dinner with Sharp that day, and Sharp told CS1 that he had moved all of his K-2 from Watkins' house into a storage locker.

"The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is 'a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* "Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented." *Id.*

Here, investigators had substantial information from multiple sources that Sharp was engaged in the distribution of synthetic cannabinoids. According to CS1, Watkins was assisting Sharp in that operation, the Spice was manufactured in Watkins' basement, and there was a substantial quantity of drugs stored there. By the time the application for the federal search warrant was submitted on May 6, 2014, authorities had verified much of the information provided by CS1 through surveillance and other sources. While Sharp allegedly told CS1 on May 4 that he had moved the drugs to a storage locker, it was nonetheless reasonable for authorities to conclude there was a "fair probability" evidence of Defendants' illegal activity could be found at Watkins' residence. Accordingly, even *if* evidence obtained from the state tracking warrant is removed from the application for the federal warrants, the remaining information nonetheless supports a finding of probable cause to search Watkins' residence. Accordingly, Watkins' motion to suppress may also be denied on that ground.

### C. Does Watkins have Standing to Challenge the State Tracking Warrant?

As a final fallback position, the Government argues that even *if* the state tracking warrant is invalid, and *if* the search warrant for Watkins' residence is not supported by

probable cause when information obtained from the tracking warrant is removed, Watkins' motion fails nonetheless because he lacks standing to challenge the validity of the tracking warrant. As set forth above, I do not believe that either of the two contingencies is met here, and therefore it is unnecessary to address this question. That is, I believe the tracking warrant is valid and, in any event, information obtained from the tracking warrant is not needed to establish probable cause to search Watkins' residence. Nonetheless, I will briefly address this issue.

The state tracking warrant authorized authorities to place a tracking device on an orange Land Rover owned by Sharp. Because Watkins had no ownership interest in the vehicle, the Government argues that he has no standing to challenge the validity of the warrant. Watkins argues, on the other hand, that because information obtained from the tracking warrant was used to establish probable cause to search Watkins' residence, he has standing to challenge the underlying warrant.

Neither party cited any authority directly on point. In support of its argument that Watkins lacks standing to challenge the tracking warrant, the Government cites the familiar rule that "Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Anguiano*, 2015 WL 4604960 at \*4 (8th Cir., dec. Aug. 3, 2015) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004)). That is, "an individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" *Id.* (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).

Here, the state tracking warrant authorized law enforcement to place a tracking device on Sharp's orange Land Rover. Watkins does not, and cannot, argue that he had an "expectation of privacy" in Sharp's vehicle. If the Government offered the evidence obtained from the tracking warrant at trial, Watkins would lack standing to challenge the validity of the tracking warrant. Here, the Government used evidence obtained from the

23

tracking warrant to support its application for a search warrant on Watkins' residence. It is logical to conclude that if he lacks standing to challenge the tracking warrant at trial, then he also lacks standing when the information obtained is used for another purpose.

### D. Summary

As set forth above, I do not find any *Franks* violation and, therefore, the state tracking warrant was valid. Information obtained from the tracking warrant was properly included in the federal search warrant application and, therefore, there was probable cause to search Sharp's storage unit. Sharp's motion to suppress evidence obtained from the storage unit should be denied.

I further conclude that Watkins lacks standing to challenge the validity of the state warrant permitting a tracking device to be placed on Sharp's vehicle. In any event, as set forth above, the tracking warrant was valid, and information obtained from the warrant was properly included in the federal search warrant application. Even *if* Watkins has standing to challenge the state tracking warrant, and *if* the state tracking warrant is invalid, the remaining information found in the federal search warrant application establishes probable cause to search Watkins' residence. Accordingly, Watkins' motion to suppress must also be denied.

### V. RECOMMENDATION

For the reasons set forth above, it is respectfully **RECOMMENDED** that the Amended Motion to Suppress (docket number 60) filed by Defendant Wayne Christopher Watkins, and the Amended Motion to Suppress (docket number 64) filed by Defendant Robert Carl Sharp be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record*

*the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on August 17, 2015.*

DATED this 31st day of August, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA